And we'll move to our second argument of the morning in Appeal Number 21-3394, Kevin Deeren v. Richard Anderson. Good morning, Mr. O'Brien. Good morning, Your Honors. Thank you. My name is Tim O'Brien and I represent the Plaintiff Appellant Kevin Deeren. Your Honors, running for elective office can be a rough and tumble business. In the heat of the political battle, the First Amendment can act as a shield and it can act as a sword. It can empower a candidate to speak and it can protect those who speak against the candidate. But the First Amendment is not a shield which allows a campaign of retaliation and harassment, even petty harassment, by an elected official against their employee who chooses to run for office. And in this case, the perpetrators of the harassment, using information that only they got through the employment, were his supervisors and then the newly elected sheriff. No one in this case disputes that Mr. Deeren meets his first requirement to prove a violation of his First Amendment rights. Mr. O'Brien, can I ask you a question just on the facts? I just want to understand the facts. I understand that he complains of several acts of retaliation. But the way I read it, there's only two acts of retaliation that exist before the sheriff's department found out that he had failed to disclose his sexual assault charge. And the one is the sheriff refers to him as a bad guy and says he was demoted. And the second one was the increased patrols in the Hague area. Everything else, I think, comes after they found out that he had failed to disclose his sex assault charge in South Carolina. Well, there's an issue of fact, Your Honor, I believe, on what the sheriff knew and when he knew it. Well, wait a minute. No. There's all evidence on one side that the people did not review the report. And then you're speculating on the other side that they did. And you want to present that to the argument, to the jury. But you have no facts to prove that they did. You're just arguing that they should have. Oh, I understand, Your Honor, what you're saying is, in essence, what the defendants are arguing is if we say it, it must be true. But there are laws that they were to follow in what they were to do when they received that clear report. They talk about the NCIC report. Well, where does the law say they have to run a clear report or they even have to look at it? They can hire whoever they want as long as he's not a felon. And by the way, I think they could hire a felon. I think if he doesn't have the ability to possess a firearm, I think they can still hire him. I don't know for sure. But in my prior career, I actually came across police officers in some jurisdictions that could not carry a firearm. It's a little weird, but it does happen. Well, the employment activity, and I lost a little sight of the original question you're asking, but the clear report was provided. It was looked at, evidently, by two people who were supposed to. And the purpose was to find out, is he a felon? I mean, that's the major purpose of that report. And so they had gotten it. It appeared to be followed the chain of command. One person gets it, looks at it, gives it to a supervisor. That person gets it and says to the sheriff, no issues with this. Now, I understand that they're saying, well, that's not what happened. We just didn't look at what we needed to look at, and therefore, no harm, no foul. That's not what, you know, that's one interpretation. The other interpretation by the plaintiffs is they were required to look at this. They wouldn't have done it. And that's a question for the jury to ask. Who's telling the truth here? So I was saying that no one disputes that Mr. Deeren meets his first requirement, that his speech was constitutionally protected. But the question is, these deprivations, were they likely to deter free speech? And was it a motivating factor? The district court's ruling, Your Honors, means that if a public employee runs for office, he or she has lesser First Amendment protections if they are retaliated by their own employer. And that is an extremely dangerous precedent. And more importantly, it's not supported by this circuit or any other circuit's law. Now, the defendants have argued or they're asserting plaintiff doesn't recognize there's a contextual difference if you're running for office because the give and take of politics. And in making that argument... Is that a relevant consideration in your view? It is a relevant consideration. Well, I better be careful what I'm going to say. No, no, no. Is the context that the speech and the alleged retaliation occurred within the kind of heat of a political campaign, is that a pertinent First Amendment consideration? I believe it's a pertinent First Amendment consideration, but the difficulty with the analysis that the defense gives you, Your Honor, is they only focus on one part of the equation. What is the employee's First Amendment right if the employee... Or what is the person's First Amendment right if they enter the political realm? But there's another side to this, and that is what is the duty of the employer as to their employee, even if that person is in the political realm? So let me... Sure. This case is very, very easy to get drawn into the facts because the facts are... There's a lot of them. It's messy, all that. But what I'm most interested in for oral argument here are some of these legal lines. Okay? So let me give you a hypothetical. And what I'm trying to get at is whether an employer can consider something that an employee... Put it in the context of a sheriff's race. An employee said in the midst of the political campaign. So suppose, for example, a deputy sheriff running for sheriff made comments about, if I'm elected, I will not enforce existing prohibitions against the use of X drug. Or further suppose that the deputy said something that raised real concerns about... Can the sheriff employer consider that after the race is over for purposes of whether the deputy is fit to remain in service? Yes, I think the sheriff could consider... What's the legal test? The legal test is whether the sheriff is using it as a part of a pattern of harassment. In other words, is the sheriff retaliating for what the person has said or done as opposed to if he brings them back in? Well, okay. You've got to go further than that. Okay? You've got to go further. I think it's definitely responsive to the speech that occurred in the context of the campaign. Don't you have to get more at wouldn't it deter similar campaign speech protected by the First Amendment by a person of ordinary fitness running for that office? Yes, it would. And I believe that's the point we were trying to make, Your Honor, is if the person uses their position as sheriff to say you said this, now I'm going to retaliate. We allege, of course, he's done it before. And I'm going to change... Okay, drop the label retaliation. Okay. Okay, forget that. Sure. Because that may be assuming the conclusion. What is it about where we stand with our First Amendment jurisprudence or the Supreme Court that does not permit the employer to consider that speech without stepping over a forbidden legal line? Because in the employment context, Your Honor, or in the First Amendment with employment, would it deter a person of ordinary firmness from continuing to engage in protected activity? And so if it is the employer using the political speech against the person, then it does impact the First Amendment. What's the best authority you have for that? That's pretty broad. Well, the Sarita case, Your Honor, talks about that, and then the... I don't mean to throw you off your pins here. Keep going. No. That strikes me as broader than where the Supreme Court is at in this area. Well, I... Because what you've excised from your proposed test is a person of ordinary fitness, and you have to measure the person by the context in which the speech occurs, a person running a political campaign. And I understand that, you know, if you step into the political realm, then all's fair in love and war kind of thing in politics. I get that part of it. But when you're using information that's only available to the employer through the employment context and using that against the person, if I'm the deputy who's going to run against the sheriff, that makes it a much greater issue. Should I speak out even though I feel I have the right to? Should I do that knowing if my employer can take things from my personnel file and make them public to people? Okay. Go ahead. What if, Mr. O'Brien, the information didn't come through the file? If it did not come through the file? I'm just giving you a different hypothetical. Sure. And it came to the attention of the sheriff. Sure. The employer still has a duty not to provide information that... Bob, let me take a step back. So you're saying that a third party just says... Let's say a phone call from the North Carolina sheriff. He met at a convention. He knows this sheriff and passes on that information. Well, in this case, it's a little nuanced, obviously, because there are laws in South Carolina, I believe it was, that they shouldn't be allowed to use this information. But if it's simply in the give and take of the political process, Your Honor, I understand what you're saying in that you should be prepared that people may bring up information that they pick up. But that's not this case. And that's the difficulty sometimes as we try to navigate these cases that some seem to say that if it's politics, anything goes. Some of the district court cases. But when you look at them closely, that's not exactly what they say. They're talking about one political... Two people on the city council, for example, saying, I don't agree with you. Or you're a Democrat and I'm a Republican and we fight, but we have the majority. So I think it is a different type of... So the chief of police here from that neighboring community... Is it Aseo? Aseo. Aseo, okay. Asked Semmingsen what he thought about your client taking a position in Aseo. So it's basically a job reference inquiry. Can we at least agree upon that? Not exactly, because we think Semmingsen is the one who started the conversation and said, I don't want him here. I don't want him in my county. Okay, what in the record suggests that Semmingsen was the one that did the outreach? There is in the record, as I understand it, Judge, and I didn't write the brief because my partner is no longer here, but the point being, in the record, it says somebody from the sheriff's department contacted Aseo, brought the police chief, came to talk to Semmingsen, and that's when Semmingsen started making these statements unsolicited. I don't think you should hire him as a police officer. He might have access to certain information. So your view is that's initiated by Semmingsen? The conversation, at least, on this issue was certainly initiated by him, because he's the one who initially said, you know, that he ran or he said these things during the campaign. Okay, well, we can check it as a factual matter. Here's my question. Hypothesize that we flip it. Hypothesize that Aseo reached out to Semmingsen. Does the First Amendment prohibit him from answering that question if all he has to say is not positive? In other words, I'm about to give a negative job reference, and the question is, does the First Amendment prohibit that? Because to give the negative job reference, to say I wouldn't trust him with personnel records, crosses a line into retaliation. Well, yeah, in a sense it does, because you have a sheriff who is not being asked for a job evaluation of this person. He's saying he's done things that I won't let him have access to our system if you hire him. Therefore, you should not hire him. So he is retaliating for Mr. Deeren's initial conversation in the political sphere. Okay, very well. You want to save a little time for rebuttal? I do have. Yes, Your Honor. Thank you. Mr. Stadler, good morning. We'll turn to you. Good morning. I've been doing this long enough where they gave me new parts, so I apologize for the slowness. No need to apologize. Whenever you're ready. Good morning, Mr. O'Brien. Good morning, Your Honors. May it please the Court, my name is Ron Stadler, and I represent the defendants in this matter, Brett Summington, Rich Anderson, and Harlan Reinders. The Court's questions were very interesting this morning because I think it reflects a fundamental failure by the plaintiff to recognize the actual facts and deal with the actual facts rather than what he would like the facts to have been. When we look at this case, he relies a lot on this claim of, there must have been retaliation here, and I'll quote from Plaintiff's Counsel, because the sheriff relayed information only available through the employment context. It's a nice argument, but it's not the facts of this case. And when you look at the facts, and I'll go back to what you asked about Judge Flong, third parties, the record here is replete with the fact that third parties learned about the fact that Kevin Dearin in 2007 was arrested for felony sexual assault in South Carolina. Now, that information was not in some way privileged, protected, or known only to these defendants. There's ample testimony, and the most testimony that I think is really key comes from Sally Miller, and Ms. Miller kind of has a dual role. She's on the County Board. There's no allegations against her that she somehow was acting in that position, but she's a victim coordinator for an abuse organization. She has one of her clients who comes to her, and this is her sworn testimony, and says, I want you to tell the county that Kevin Dearin, one of your deputies, was arrested in 2007 for sexual assault in South Carolina. That's the first indication that we have that this is public knowledge. And then Sally Miller goes on, and the plaintiff wants to say, oh, well, you know, she really didn't tell anyone. It was everybody else who told everybody. There was not a single person in the record who came forward to say, Rich Anderson, Brett Semingsen, or Harlan Reinders told me about this. What you have is Sally Miller's testimony where she says, yeah, I told this guy at a County Board meeting about it. I told my husband about it. I mentioned it to Mr. Dearin at a public event in front of my husband, my son, other people in the crowd, and the district attorney, and I said to Mr. Dearin, tell me about your sexual assault in 2007. So there is nothing in this case about the defendants here having somehow spread things out that they couldn't, shouldn't, or wouldn't have. I'll go back to the clear report because I want to make sure that everybody understands the record on that and what that is. I heard counsel talk about the law requires and duty requires. There is no law and there is no duty to run a clear report. In fact, this is the first time that Trumplow County had ever used a clear report. But what a county does, and this is in the record, is it runs a background check. And one of the things that it does, and one of the first things that it does, is it runs the NCIS National Criminal Database to see if there's a record on this applicant. And here there was none. The clear report isn't run for the fact that they want to double-check NCIS. If it's not in NCIS, it probably didn't happen. And Trumplow County has never had a situation where there was information not in NCIS that showed up somewhere else. But what the clear report does is it says, Mr. Dearin has lived at these addresses and these locations. He's owned these vehicles. He's had a mortgage on this property. It leads you to know who the person is in terms of where they have lived and who they have associated with. But, and I don't remember who asked the question, but it was very poignant, there's nothing to show that Harlan Reinders saw that clear report prior to 2018. Was it received by the county? Yeah. Laszlo said, you know, I kind of got it in a packet and I put it in an envelope and I said, here, here's my background report, you can check it out. No evidence at all to show that the county saw that and at that time knew. And I just have to say that the only thing that the NCIS, or that the clear report actually shows is that Mr. Dearin was arrested and charged for felony sexual assault in South Carolina in 2007. It shows nothing about the disposition of the charge. And it would be absolutely remarkable for an employer, much less a law enforcement employer, to know that its applicant for employment was charged with felony sexual assault and just said, oh, that's nice to know. Mr. Saylor, I have a question. Where do you propose that we draw legal lines here? And the reason I ask that is the same reasons I was asking Mr. O'Brien. And one of the points you make in your brief is that Mr. Dearin needs to take the consequences, needs to accept the consequences for what he said in the course of the political campaign. And the proposition or the authority that you rely upon for that is a labor relations case from 1943. Correct. I mean, is that the best legal authority that you can come up with that defines the parameters of this dispute between the parties? It's really an interesting dispute, and it has layers to it that I think we don't see in a lot of other cases. What tests do you propose? It can't possibly be that once the plaintiff speaks in a political campaign that anything can go for the employer. And that's not our test. Okay. What's the test? And I have repeated in our briefs, and I'll repeat it here, it's contextual. And let me draw the distinction on the context. I think that's right. What's the test? And I'm somewhat arguing against myself, but I don't think the test is that once you announce you're running for sheriff, the gloves are off and I can do anything I want to you. And that didn't happen here. But you have to contextualize it this way. I do believe that as an employee, an employee who is running for a political office has some greater protections. And I can't take adverse employment actions against you because you're running against me. Well, wait, they don't have greater protections. They might have the same protections, but why would they have greater protections if they're running for public office? It's just an objective test, right? Under the second prong, the question is whether or not the deprivation would likely deter the individual from suffering or from exercising their First Amendment, right? Correct. You just take that employee and say, would it deter an objective person in his position or her position from running for elective office? I absolutely agree with you. My contextualization is that demarcation line between when I am an employee and then May 5th of 2018 when Kevin Deere and submits his resignation and says, you know what? I'm not your employee anymore. I am running for sheriff full time and that's all I'm doing. All right. So I don't I don't know. So he's definitely at that point in time not speaking as an employee. Correct. And he's speaking on matters of public concern. So we know under Garcetti, it's First Amendment protected. What I'm trying to get at is what's the test on the retaliation then? Of course, we've got to consider the context of the political campaign. Once he's on that political realm and he's a politician. And you've already agreed it's not everything goes. No, I'm saying once he's fully political, he's no longer employed. At that point, I would look at it in terms of the cases that we cited in our brief footed in the other cases. Politicians need to have a thick skin. And the other thing is no adverse action was taken against Kevin Deere and in his run for sheriff in that political context. OK, let me ask the question this way. It's the same exact question. When when Osceo reaches out. OK, I'll say whatever they are. Osceo. Osceo. OK. When they reach out. Can. Semington say whatever he wants. Are there any limits on what Semington can say to the chief of police? When the chief of police says, I'm thinking about hiring Mr. Deere in. And I'd like your perspective on him. You just ran against him in a political campaign and you worked with him as a colleague. Are there any limits in your view on what Semington can say? I don't believe so. And I would point you to Hutchins versus Clark. Court says where public officials allege retaliation is in the nature of speech. Such speech does not adversely affect a citizen's First Amendment rights, even if defamatory. I mean, you've got to get to the point that there's a threat of coercion or intimidation, that there's going to be punishment or a sanction. And none of that was directed to Kevin Deere. Don't forget, these defendants have their own First Amendment rights. They get to speak. So if Rich Anderson thinks that Kevin Deere is a bad guy. So even a barrel of lies. I absolutely would not hire him. He was embezzling money. He was stealing office supplies. He wrecked two police cars. He engaged in several unauthorized shootings. Just make it up. There's no limits on it. It's a great hypothetical. I think you could expose yourself to a claim for defamation. But I don't believe you expose yourself to a claim of First Amendment retaliation because it was purely in the political context. And that, in your judgment, would not deter a person of ordinary fitness from running for office if they thought their prior employer could just level a whole barrel of lies on a prospective future employer? I think that comes with the nature of politics. Okay. I do want to go back and just touch on the issue in regard to the question that was asked about, well, what about these things that happened after November 29th? That is the demarcation because Deere didn't announce until November 29th that he's running for sheriff. And the only things we have after that is that allegedly Anderson says to some person, Deere is a bad guy. Okay. He's a bad guy. That is not something that is sufficient to deter somebody in their free speech. It, too, is Anderson having his own rights to free speech that he can say Deere is a bad guy if he thinks Deere is a bad guy. He can go to the assistant district attorney and say to him, he's a lot of trouble. I don't think he's a good guy. That's not impermissible. It's not a violation of Deere's First Amendment rights. None of that is a violation at all. And I want to go back to that point of the things that Deere alleges after he became a politician. Really, the only thing he has at that point is Seminsen's comments to Osseo. And just to answer the question that you had before, Judge Skutter, it was not that Brett Seminsen went to the police chief from Osseo and talked to him about Kevin Deere. The record will show to you that the chief from Osseo came to Mr. Seminsen's office to tell him, hey, I'm thinking about hiring Deere. Unprompted? Unprompted. Okay, where's that at in the record? It's all over in the record, both in his declaration and in Mr. Seminsen's testimony. Who's he, the Osseo? The Osseo chief, Bill Prudlick. What's his name? Bill Prudlick. Prudlick supported Deere when he ran for sheriff, right? Correct. He had been a Deere supporter, put a sign in his yard. No surprise that maybe he was going to offer him a job after Deere lost. Which may have been the reason he went to the winner of the sheriff's race, right? Because the sheriff is probably providing some services, I suspect, to the city. There's a relationship between the two. The city's within the county, so certainly they have a relationship. He did offer him a job, just not the one he wanted.  He ended up saying, after talking to Seminsen, he said, I'm not going to hire him as a patrol officer, but I will hire him as our training officer. And there was no objection from Seminsen about that. He never went to Prudlick and said, I don't want Deere working anywhere in this county. He never did that. He just didn't want to have him on patrol where he had access to their computerized database, which would give them access to personnel records in the sheriff's department. Just an interesting note in regard to Prudlick. Prudlick was a former deputy for the sheriff's department, who himself had been told, you're either going to quit or you're going to be fired because of dishonesty. And his dishonesty was lying over whether he had posted a note, a derogatory note, on a wall. Kevin Deeren lied. And he lied over and over and over again. And when he was asked factual questions about the sexual assault, he refused to answer those questions. He doesn't have a right to refuse to answer those questions. He was obligated to answer them. There was no law that said he could invoke any kind of right to refuse to answer them, and he refused. And he was dishonest. Those were ample grounds for the recommendation for his termination. So I see that my time is up, and I thank you all. No, thanks to you, Mr. Stadler. Mr. O'Brien, yeah, come on back up. Yeah, we asked you a lot of questions. Why don't we give you a couple minutes on rebuttal? Your Honors, there was a statement made that there were no adverse employment actions taken. What were the protections? And I'd like to focus just quickly on this personnel file open records issue, because no one's asked about that. The defense is stating that a judge decided what could be released. That is not what occurred. The duty is on the county to determine what can be released on an open records request. And you see the retaliation when they release positive information on the favored candidate but not on the other candidate. So if you look at Section 19.31 through 33, even if the judge rules on certain issues, it's still up to the sheriff, in this case, to determine what should and shouldn't be released. So I wanted to point that out because they had talked about there weren't adverse things. Well, that only came through his employment through his personnel file and what was released. The defense also cites to foot it. And we've covered this, I think, in the briefs. But even in that case, Judge Peterson talked about this could be a different case if this person was an employee-employer relationship. But that's not what I had before me. These were, in effect, equals in the political realm. And then in Osseo, again, I want to come back to it because the facts are that Semingson, regardless of who brought who to whom's room, started the conversation by noting, well, I saw you had that Dierens sign in your front yard, clearly bringing it back to the campaign and then saying, I don't think you should hire him. You really think it's regardless to regardless of who initiated it? It's of no legal consequence? Regardless of who set the meeting? Yeah. Well, the meeting might not have been anything about hiring him. It might have just been police chief and sheriff meeting. Go ahead. Okay. I see my time is up. Okay. No, very well. Thanks to both counsel. Appreciate it very much. We'll take the case under advisement.